*United States Bankruptcy Court*
*District of New Jersey*
*Clarkson S. Fisher Federal Building*
*United States Courthouse*
*402 East State Street*
*Trenton, New Jersey 08608*

*Hon. Kathryn C. Ferguson, USBJ*                                   *(609) 989-0494*

August 22, 2011

Ryan Lamb, Esquire
Law Offices of Georgette Miller
335 Evesham Avenue
Lawnside, New Jersey 08045

William M.E. Powers III, Esquire
Powers Kirn, LLC
728 Marne Highway
PO Box 848
Moorestown, New Jersey 08057

                    Re:    Harry and Crystal Lofton
                           Case No. 10-37223

                           Evidentiary Hearing
                           June 28, 2011

Dear Counsel:

        Harry and Crystal Lofton ("Debtors") filed a Chapter 13 petition on September 1, 2010.

On Schedule A, the Debtors list the current value of 14 Owen Lane, Willingboro, NJ as

$147,000.  In the plan, the Debtors list the amount of the first mortgage on the property as

$163,796, and the second mortgage held by Wells Fargo Bank as $23,325.  Based on those

numbers, the Debtors propose to cram down Wells Fargo's second mortgage and treat it as an

unsecured claim.

On June 28, 2011, the court held an evidentiary hearing for the purpose of determining the value of 14 Owen Lane, Willingboro, NJ for confirmation purposes.  The Debtors and Wells Fargo each presented appraisals of the property.  The parties stipulated to the admissibility of the appraisals.  Wells Fargo submitted an appraisal prepared by Donald A. Schulte.  Mr. Schulte opined that the fair market value of the property as of September 1, 2010 was $195,000.  The Debtors submitted an appraisal prepared by Walter A. Kirk.  Mr. Kirk opined that the fair market value of the property as of February 22, 2011 was $125,000.

The five comparables in Wells Fargo's report range in price from $183,580 to $243,000 and were sold during the period of October 2009 through July 2010.  The six comparables in the Debtors' report range in price from $101,000 to $157,000 and were sold during the period from April 2010 through October 2010.   The primary difference between the two appraisal reports was that Wells Fargo's report excluded distressed properties and the Debtors' report included them.

During cross-examination, Wells Fargo's appraiser, Mr. Schulte, was asked why all but one of comparables he chose were in excess of $200,000 when there had been lower value sales in the same time period.  Mr. Schulte responded that he had excluded all "short sales" or bank owned properties.  When pressed as to why he had done so, Mr. Schulte stated that the REO sales (foreclosures) simply were not good indicators of value.  He made that statement despite the fact that in his report he checked "yes" next to the question: "Are foreclosure sales (REO sales) a factor in the market?"  Mr. Schulte then noted that "Approximately 25% of the sales over the last 12 months were REO properties.  They are a factor in the subject's market place." *Wells Fargo Appraisal Report* at 19.  Mr. Schulte also testified that REI properties have an effect on value.  At the hearing, Mr. Schulte never  satisfactory explained why excluding a quarter of the

subject market results in a more accurate estimation of fair market value.  It is notable that in the month of October 2010 (one month from the date of the Wells Fargo report) three houses[1] in the immediate neighborhood of the subject property were sold and not one of them was sold for in excess of $200,000.

By contrast, the Debtors' appraiser, Mr. Kirk, persuasively testified that it is appropriate to use foreclosure sales as comparables because that is the reality of this market and a buyer will be comparing the price of the subject house with those in the neighborhood.  He explained that given the principal of substitution, a buyer will not pay more for a product when a similar, lower-priced product is readily available.  In cross-examination, Wells Fargo's counsel pressed Mr. Kirk about the propriety of using foreclosed properties as comparable sales.  Mr. Kirk responded that the comparable sales he chose best illustrated the market in that neighborhood at that time and if the sales are non-traditional it indicates by the sheer number that foreclosures are a significant portion of the market.  Mr. Kirk said that his educated guess would be that at least 20% of the properties in Willingboro are distressed sales at this time.

The court concurs with Mr. Kirk's decision to include distressed sales in his  valuation. The general rule of not including foreclosure sales when determining fair market value simply does not stand up in the current market.  To exclude a quarter of the market would result in a skewed estimate of value.  The Debtors' appraiser reasonably pointed out that the primary motivation for people to sell at the current time is to avoid foreclosure; homeowners in good financial shape are not putting their houses on the market because the market is so depressed.

The court also found the Debtors' appraisal to be more reliable because the comparables their expert relied upon required little to no adjustments.  Willingboro, being a Levittown,

---

[1] The three houses sold for $101,000; $105,000 and $157,000.

presents a unique opportunity to compare numerous nearly identical houses.  Mr. Kirk testified

that for the comparables he chose only the exact same model home as the Debtors' home and

only those located in the Debtors' neighborhood of Garfield East.  Wells Fargo's expert, because

he chose to exclude distressed sales, had to use comparables that were different models and some

of the them were outside the Garfield East neighborhood.  As a result, adjustments had to be

made for homes that were larger than the Debtors' home and in far superior condition.

Logically, the fewer adjustments that need to be made, the more accurate the comparison.

In addition to finding that the Debtors' appraiser chose more accurate comparables, the

court is disinclined to rely on the valuation in the Wells Fargo appraisal because of internal

inconsistencies in the report itself.  On the first page of the report it states: "Market conditions in

subject's neighborhood indicate a relatively stable value trend."  But on the following page it

states: "According to TrendMLS data the median sales prices decreased 10.7% from September

2009 to September 2010".  In the sales comparison analysis section it states that only two of the

five comparables have been sold in the last twelve months but the "Date of Sale/Time" entry for

all five comparables indicates that they all sold within twelve months of the date of the report.

Such inconsistences, even if mere typos, seriously undermine the reliability of the appraisal.

Overall, the court finds the appraisal report and the testimony of the Debtors' appraiser to

be the most persuasive and will use the value of $125,000 as the starting point.  The Debtors'

appraisal report was not a retrospective analysis and gave a value as of February 22, 2011.

When Mr. Kirk was asked at the hearing what the value would have been on September 1, 2010

(the date of filing) he estimated 5% more.  Based on that, the court will assign a value of

$131,250 to the property for confirmation purposes.


                                          _*/s/ Kathryn C. Ferguson*_
                                          KATHRYN C. FERGUSON
                                          US Bankruptcy Judge

Dated:  August 22, 2011